**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**GREENVILLE DIVISION**

CHARLES WHITE, on his own
behalf and others similarly situated                                        PLAINTIFFS

V.                                                                CAUSE NO.: 4:11CV007-SA-JMV

NTC TRANSPORTATION, INC., et al.                                      DEFENDANTS

## MEMORANDUM OPINION

This cause is before the Court on Defendants' Motion for Decertification [131]. The Court previously granted Plaintiff's Motion for Conditional Class Certification and Court-Authorized Notice [11]. Upon due consideration of the motion, responses, rules, and authorities, the Court finds Defendants' Motion for Decertification is not well taken and shall be DENIED.

*Certification and Decertification Standard*

The Fair Labor Standards Act (FLSA) requires covered employers to compensate non-exempt employees at a statutorily-mandated minimum wage and at overtime rates when they work in excess of forty hours per week. 29 U.S.C. § 207(a). If an employee is not paid minimum wage or unlawfully denied overtime, section 16(b) of the FLSA permits him to bring suit against his employer "for and in behalf of himself . . . and other employees similarly situated." Id. at § 216(b). "No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." Id. Thus, § 216(b) actions follow an "opt-in" procedure, rather than an "opt-out" procedure. See Mooney v. Aramco Servs. Co., 54 F.3d 1207, 1212 (5th Cir. 1995), overruled on other grounds by Desert Palace v. Costa, 539 U.S. 90, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003). Although the Fifth Circuit has expressly refused to endorse a singular method for district courts to use when determining whether a collective action should be certified in FLSA actions, the

majority of district courts have applied the <u>Lusardi v. Xerox Corp.</u>, 118 F.R.D. 351 (D.N.J. 1987), approach.[1] <u>Lusardi</u> advises a two-step certification analysis: (1) the notice stage, and (2) the "opt-in," "merits," or decertification stage.

In the notice stage, the Court, using a "fairly lenient standard," determines whether a conditional class should be certified. <u>Mooney</u>, 54 F.3d at 1214. This decision is within the district court's discretion and is not mandatory. <u>See</u> <u>Songer v. Dillon Resources, Inc.</u>, 569 F. Supp. 2d 703, 705-06 (N.D. Tex. 2008) (citing <u>Hoffmann-La Roche Inc. v. Sperling</u>, 493 U.S. 165, 169, 110 S. Ct. 482, 107 L. Ed. 2d 480 (1989)). The notice stage typically occurs early in the litigation, and it is usually based on the pleadings and any attached affidavits. <u>Mooney</u>, 54 F.3d at 1214. To satisfy his burden, the plaintiff must provide competent evidence to show that a similarly situated group of potential plaintiffs exists. <u>Id</u>. "At the notice stage, 'courts appear to require nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan infected by discrimination.'" <u>Mooney</u>, 54 F.3d at 1214 n.8 (citing <u>Sperling v. Hoffman-La Roche, Inc.</u>, 118 F.R.D. 392, 407 (D.N.J. 1988)). Relevant factors to guide the Court are "whether potential plaintiffs were identified, whether affidavits of potential plaintiffs were submitted, and whether evidence of a widespread plan was submitted." <u>Songer</u>, 569 F. Supp. 2d at 707 (citing <u>H & R Block, Ltd v. Housden</u>, 186 F.R.D. 399, 400 (E.D. Tex. 1999)).

The Court can 'decertify' the class following discovery when the Court has more information to achieve a factual determination on the similarly situated question. <u>See</u> <u>Ray v. Motel 6 Operating, Ltd. Pshp.</u>, 1996 WL 938231 at *2 (D. Minn. Mar. 18, 1996). At the

---

[1] The other approach recognized by the Fifth Circuit is known as the "spurious class action approach," whereby district courts analyze the motion for certification in light of Rule 23. <u>Mooney</u>, 54 F.3d at 1214 (citing <u>Shushan v. Univ. of Colo.</u>, 132 F.R.D. 263 (D.Colo. 1990)).

decertification stage, the Court is required to "look beyond the pleadings and affidavits," and make its determination "in light of all information gathered during the post-opt-in discovery." Gallender v. Empire Fire & Marine Ins. Co., 2007 WL 325792 at *2 (S.D. Miss. Jan. 31, 2007). The term "similarly situated" is not defined by the FLSA and courts continue to search for a meaning when reviewing collective actions. See Acevedo v. Allsup's Convenience Stores, Inc., 600 F.3d 516, 519 (5th Cir. 2010) ("[W]e have not adopted any of the varying approaches for determining whether employees' claims are sufficiently similar to support maintenance of a representative action."). Courts following the Lusardi approach have looked to several factors in determining whether a conditionally certified class should be decertified and "generally look to whether the proposed class members are similarly situated with respect to their job requirements and with regard to their pay provisions." Gatewood v. Koch Foods of Miss., LLC, 2009 WL 8642001 at *13 (S.D. Miss. Oct. 20, 2009) (internal quotations omitted).

Many courts look to the following factors in evaluating whether plaintiffs are similarly situated: "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations." Id. (citing Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1103 (10th Cir. 2001)). Importantly, the standard for collective actions is not that plaintiffs are identically situated but rather only that they are similarly situated. Id. (citing Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1219 (11th Cir. 2001) (Plaintiffs "need show only that their positions are similar, not identical, to the positions held by the putative class members.")).

Though heightened at the decertification stage, the "similarly situated" requirement of §

3

216(b) is still considerably less stringent than the commonality requirements for class certification under Rule 23 of the Federal Rules of Civil Procedure. O'Brien v. Ed Donnelly Enter., Inc., 575 F.3d 567, 584 (6th Cir. 2009) (citing Grayson v. K Mart Corp., 79 F.3d 1086, 1096 (11th Cir. 1996)). "If the claimants are similarly situated, the district court allows the representative action to proceed to trial. If the claimants are not similarly situated, the district court decertifies the class, and the opt-in plaintiffs are dismissed without prejudice. The class representatives-i.e. the original plaintiffs-proceed to trial on their individual claims." Mooney, 54 F.3d at 1214.

*Discussion and Analysis*

NTC Transportation, Inc. ("NTC") is a transportation company that provides various services including, but not limited to, non-emergency passenger transportation, shuttle service, and package delivery. Defendants Jackie and Evelyn Netterville own and operate NTC. Plaintiff Charles White was an hourly-paid driver employed by NTC. He seeks to bring this FLSA suit on behalf of himself and those similarly situated. The Court previously granted Plaintiff's Motion for Conditional Class Certification and Court-Authorized Notice [11], finding that Plaintiff had met the "fairly lenient" standard of the notice stage of certification. The Court conditionally certified the following class for the purposes of discovery and authorized the Plaintiff to give notice of the lawsuit to potential class members:

> [A]ll hourly paid non-emergency medical transport drivers who worked for Defendants NTC Transportation, Jackie Netterville and Evelyn Netterville during the past three years and who were not paid for all of the compensable time spent working for Defendants, including but not limited to, time spent in Defendants' vehicles waiting for patients to complete their appointments and time spent working through an automatically deduced one hour lunch.

In addition to the named Plaintiff Charles White, ninety Plaintiffs have opted-in to this

4

lawsuit to date.[2]  In moving the Court to decertify the class, Defendants argue that application of the recognized factors to the instant facts reveals Plaintiffs are not similarly situated.  In particular, Defendants argue that Plaintiffs' employment settings are factually disparate and that they have failed to prove they are similarly situated because they have not produced substantial evidence of a single decision, policy, or plan that affected them all in the same manner.  Additionally, Defendants contend that they would be prevented from meaningfully defending against a collective action because the issue of liability is so highly individualized and that fairness and efficiency considerations favor decertification.  The Court addresses each of these arguments in turn.

A.     Individual Plaintiffs' Factual and Employment Settings

It is clear from the record that Plaintiffs' factual and employment settings are not so disparate as to warrant decertification of the collective action.  Though Defendants argue that Plaintiffs worked at different office locations, during different periods of time, and traveled different daily routes transporting different patients, the record evidence does not show that there were any significant differences in Plaintiffs' duties or overall employment settings.  Each Plaintiff held the same position, performed the same duties, and was subject to the same policies and procedures regardless of location or time period.  Pursuant to the Court authorized notice, all Plaintiffs were drivers for NTC whose primary duties were to pick up, transport, and drop off non-emergency Medicaid medical patients.  All drivers began each shift by reporting to their home base to pick up a vehicle and a schedule.  During the course of their shifts, all drivers were required to keep logs of pick-ups and drop-offs, as well as to report their starting and ending times and whether the driver was considered "up" or "down."  All drivers were paid by the hour

---

[2] Six additional individuals initially opted-in to this suit but later withdrew.

and received a paycheck every two weeks. Thus, Plaintiffs' employment settings were sufficiently similar to proceed collectively.

Defendants also argue that Plaintiffs raise a variety of different legal claims. Based upon the damages information provided in discovery, Defendants contend that some Plaintiffs are asserting violations of the FLSA's minimum wage requirement while others are asserting overtime violations and still others are asserting both types of claims. However, Plaintiffs maintain they were uniformly subjected to several policies which gave rise to FLSA violations and that variations among their resulting claims do not prevent the Court from finding that Plaintiffs are similarly situated. The Court agrees.

Though the effect of Defendants' alleged policies may have differed with regard to individual Plaintiffs, the policies themselves did not vary. As discussed in further detail below, Plaintiffs base their claims, whether overtime, minimum wage, or both, on policies common to all. Plaintiffs bring their claims based upon a common legal theory that Defendants, as a result of their policies, failed to pay them for all time worked. See Hunter v. Sprint Corp., 346 F. Supp. 2d 113, 119 (D.D.C. 2004) ("[C]ourts emphasize that class members in a collective action must share more than a common allegation that they were denied overtime or paid below the minimum wage. The class members must put forth a common legal theory upon which each member is entitled to relief.") (internal citation omitted).

i.    "Downtime" Policy

Plaintiffs contend Defendants failed to pay them for all time worked due to the application of NTC's "downtime" policy. As written, the policy states:

> From time to time, drivers may experience down time as a result of having no
> passengers to transport during the course of a shift.  Under such circumstances,

the company prefers to put the driver on down time until an appointment has been confirmed to transport a passenger. As a result, the driver is free to pursue personal and social activities during down time.

The written policy also outlines the scale NTC was to pay drivers during downtime.[3] Though Plaintiffs concede the downtime policy does not violate the FLSA as written, they maintain Defendants' application of the policy resulted in the failure to pay Plaintiffs for legally compensable time.

Plaintiffs claim that in conjunction with the downtime policy they were subjected to another written policy prohibiting drivers from using Defendants' vehicles for anything other than company business from the time they clocked in until the time they clocked out at the end of their shift and an unwritten policy requiring drivers to pick up patients within ten to fifteen minutes of their appointments ending. Plaintiffs claim that the combined application of these policies resulted in their not being free to use such downtime in any meaningful way, and thus, all time spent in Defendants' vehicles without patients therein was compensable time for which they should have been paid.

Defendants do not dispute that all drivers were subject to the downtime policy.[4] Rather, they contend that the policy prohibited off-the-clock work and affected each Plaintiff differently based upon the way the policy was applied. Defendants maintain that each office had its own dispatcher who had discretion to apply the downtime policy and to determine the hours worked

---

[3] The downtime policy states that drivers who were within a thirty mile radius of their home base when placed on downtime were to be paid for one hour of time. Drivers who were between thirty and sixty miles of their home base were to be paid for two hours of time, and drivers more than sixty miles from their home base were not to be placed on downtime. Plaintiffs, however, allege they were not compensated for any time spent during their shifts when patients were not in their vehicles.
[4] Defendants do dispute Plaintiffs' claims that the policy prohibiting personal use of NTC vehicles applied to drivers. Defendants claim the policy applied only to office personnel. Nevertheless, such a distinction does not prevent the Plaintiffs from being similarly situated. Defendants argue the policy applied to *no* drivers, whereas Plaintiffs argue the policy applied to *all* drivers. In either instance, all drivers would be similarly circumstanced as there is no evidence that the policy applied only to some drivers but not to others.

by each driver. Defendants argue that the dispatchers would direct the drivers throughout each shift, assigning drivers to pick-up patients based upon their location and availability and placing drivers on "down" status as needed. Thus, Defendants maintain that each driver's schedule was subject to change throughout any given shift based upon the availability of the driver and the discretion of the dispatcher. They argue that the issue of liability must therefore be determined based upon individualized proof of the way in which the downtime policy was applied to each individual driver.

Defendants cite Epps v. Oak St. Mortg. LLC, in support of their argument. 2006 WL 1460273 (M.D. Fla. May 22, 2006). In Epps a group of plaintiffs claimed to be similarly situated based on the defendant's policy of discouraging overtime. Id. at *7. The district court found the question of liability would require an individualized inquiry to determine "how or whether each individual manager implemented the policy with regard to each individual plaintiff." Id. However, unlike the case at bar, the plaintiffs in Epps alleged only a generalized practice of discouraging overtime and failed to identify a specific policy commonly applied to each plaintiff. Here, Plaintiffs allege violations caused by a specific company-wide policy. That some dispatchers may not have followed the downtime policy in some instances does not prevent the issue of liability from being determined collectively. The issue of liability for the trier of fact is whether Defendants' policies violated the FLSA and any evidence of discrepancies in the application of the downtime policy may be offered to rebut Plaintiffs' collective claims.[5]

ii.     Lunch Policy

In addition to the downtime policy, Plaintiffs claim that all drivers were subject to a "lunch" policy, pursuant to which one hour of allegedly compensable time was automatically

---

[5] See section D of this opinion.

deducted from Plaintiffs' pay, whether or not they were able to take a lunch break and despite there being no section on the drivers' timesheets to record the taking of such a break. Again, Defendants do not dispute that all drivers were subject to an automatic one hour deduction of time. Instead, Defendants argue, as they did regarding the downtime policy, that the lunch policy did not affect all Plaintiffs in the same manner because the individual dispatchers were responsible for scheduling lunch breaks for each driver. Therefore, they again argue that the issue of liability is dependent upon the way in which each dispatcher applied the lunch policy to each individual driver. In other words, Defendants contend an individual inquiry will be required to determine whether each individual driver was given the opportunity to take a lunch break by his or her dispatcher.

As with the downtime policy, the Court finds Defendants' argument unpersuasive. It is undisputed that the lunch policy applied to all locations and all drivers. Plaintiffs contend they were not given the opportunity to take lunch breaks due to the personal use policy and policy requiring timely patient pickup, policies which applied to all drivers. As such, the Court finds Plaintiffs are sufficiently similar to proceed collectively. As with the downtime policy, any evidence that dispatchers applied the policy in different ways may be offered to rebut Plaintiffs' collective claims.

iii.     Unilateral Deduction of Time

Similarly, Plaintiffs claim Defendants uniformly deducted additional time from drivers' timesheets beyond the time deducted as a result of the downtime and lunch policies. Unlike those policies, Plaintiffs do not point to a specific written or oral policy pursuant to which Defendants allegedly deducted time from drivers' pay. Instead, Plaintiffs offer their pay stubs

and time sheets as evidence that they were consistently paid for less time than was documented. In their briefing, Defendants claim that the individual dispatchers were responsible for reviewing the drivers' timesheets on a daily basis and making adjustments based upon the total amount of hours drivers claimed to have worked, the distance between patients' pick-up and drop-off locations, the time between pick-ups and drop-offs, and the dispatchers' notes regarding times drivers were "down." Defendants claim dispatchers would modify drivers' timesheets if they found any discrepancies, often without discussing the changes with the drivers. Here again, the record supports Plaintiffs' contention that their injuries were caused by a single uniform policy. Defendants' themselves claim that all dispatchers were responsible for reviewing all drivers' timesheets and deducting or correcting for time pursuant to the downtime policy. Therefore, the Court finds Plaintiffs are similarly situated with regard to the unilateral deduction of time claim.

iv.     Lift Pay Policy

Plaintiffs also allege that some drivers received incentive pay for so-called "lift hours" and that Defendants failed to include these hours in the calculation of those drivers' overtime pay. Drivers at the McComb location were paid a higher hourly rate for time operating automatic lifts for wheelchairs on vehicles. Plaintiffs allege Defendants failed to include time worked operating lift equipment in the total number of hours worked, resulting in a failure to pay drivers overtime. For example, a driver who worked forty-one hours of time compensable at his regular rate and five hours compensable at the "lift pay" rate would have been paid for only one hour of overtime rather than the six hours to which he was entitled, according to Plaintiffs' claim.

Defendants maintain that, whereas only some Plaintiffs were entitled to receive lift pay,

10

those Plaintiffs cannot be considered similarly situated. Further, Defendants argue that the lift

pay claim is completely different from the claims asserted by the named Plaintiff, Charles White,

and from the declarations Plaintiffs' submitted in support of conditional certification. While

Plaintiffs concede the lift pay policy did not apply to all Plaintiffs, they argue that the Court

should create a sub-class rather than decertify the entire action.

The Court has discretion to manage the litigation of collective actions, including the

creation of subclasses as needed. See Collins v. Sanderson Farms, Inc., 568 F. Supp. 2d 714, 721

(E.D. La. 2008) ("A district court has significant discretion to fashion the appropriate procedures

in collective actions brought under § 216(b)."); King. v. Koch Foods of Miss., LLC, 2007 WL

1098488 at *4 (S.D. Miss. Apr. 10, 2007) ("[T]he court is aware that discovery may show that

certain plaintiffs are not similarly situated, and if this is the case, the court can decertify the class

or can create subclasses."); In re Pilgrim's Pride Fair Labor Standards Act Litig., 2008 WL

4877239 at *4 (W.D. Ark. Mar. 13, 2008) ("If, [after conditional certification], the Court finds

that the case is not manageable as a collective action, the Court has the discretion to create

subclasses or to dismantle the collective action.").

Whereas all Plaintiffs, including those asserting lift pay claims, held the same position,

performed the same duties, were paid in the same manner, and were subject to three of the

policies at issue in this case, those Plaintiffs asserting additional lift pay claims should not be

precluded from proceeding collectively with the other Plaintiffs. Were the Court to decertify this

collective action, the inevitable result would be many individual, virtually identical trials.

However, the creation of a subclass, tried as a separate collective action, would also be

inappropriate in the case at bar. Were the Court to create a subclass, the resulting trial would

11

involve not only the lift pay claims but also a repetition of the other claims, arguments, and proof which are common to all Plaintiffs. Such a result would frustrate any gains in efficiency that might be afforded by creating a subclass. Accordingly, the Court, having found all Plaintiffs to be otherwise similarly situated, finds class treatment of Plaintiffs' claims appropriate and desirable.

C.     Individualized Defenses

Defendants also argue that allowing this matter to proceed as a collective action would prevent them from asserting several defenses that may apply to each Plaintiff individually. Specifically, Defendants contend individual analyses will be required to determine whether each Plaintiff (1) actually worked off-the-clock, (2) had knowledge of Defendants' policies but chose to ignore them, and/or (3) asserts *de minimis* claims. Defendants contend their due process rights would be violated by not being able to pursue each available defense against each individual Plaintiff and that their inability to defend against Plaintiffs' claims in a meaningful way would result in an unconstitutional deprivation of their property. [6]

Plaintiffs, however, argue that Defendants' rights must be balanced with the rights of the Plaintiffs. See Falcon v. Starbucks Corp., 580 F. Supp. 2d 528, 541 (S.D. Tex. 2008) (citing Wilks v. Pep Boys, 2006 WL 2821700, at *8 (M.D.Tenn.2006) ("Although the defendant contends that decertification is necessary to protect its due process rights ... these rights must be balanced with the rights of the plaintiffs")). Further, Plaintiffs argue that issues of liability are purely common and that Defendants' asserted individualized defenses relate only to damages.

---

[6] Defendants rely on Lusardi to support their position, but the Court finds that holding distinguishable. In Lusardi, the court found that "because Congress has included certain defenses within the statutory scheme of the ADEA, it is contrary to due process to prevent their utilization by a defendant in the liability phase of the trial." 118 F.R.D. at 371-72. No such statutory defenses have been asserted in the instant matter. Additionally, as Defendants' individualized defenses merely negate Plaintiffs' damages, such defenses should not preclude final certification.

To that end, Plaintiffs have filed a Motion for Bifurcation [155] requesting the Court divide this action into separate liability and damages phases.

Another district court in our circuit recently addressed similar claims of individualized defenses. In Metcalfe v. Revention, Inc., the defendants contended that:

> individualized determinations [we]re needed to resolve [their] defenses as to the claims of individual [P]laintiffs. Specifically, Defendants allege[d] that mini-trials w[ould] be necessary to evaluate whether [P]laintiffs' alleged off-the-clock activities [we]re compensable work ... [and] whether at least some of the unpaid off-the-clock work claimed by [P]laintiffs [wa]s *de minimis*.

2012 WL 3930319 at *6 (S.D. Tex. Sept. 10, 2012). The court found the defendants' argument unpersuasive, instead favoring bifurcation over decertification.

> Neither of these purported problems is a defense to liability. Whether individualized determinations are necessary to define the extent of Plaintiffs' damages, if any, does not weigh against efficiently establishing Defendants' class-wide liability. . . . Contrary to Defendants' assertion that plaintiff-by-plaintiff mini-trials [on the issue of damages] are inconsistent with collective treatment, a class-wide determination of liability followed by determination of individual damages is far more efficient than litigating each Plaintiff's case individually.

Id.

The Court finds the reasoning in Metcalfe applicable to the case at bar. Each of the defenses asserted by Defendants strikes at the issue of damages rather than liability. As the Court has explained, the ultimate issues of liability regarding Defendants' policies may be resolved collectively because the Plaintiffs are similarly situated. Other courts have likewise found the bifurcation of liability and damages stages preferable to decertification. Thiessen, 267 F.3d at 1106-07 (individualized "defenses would not become the focal point until the second stage of trial and could be dealt with in a series of individual trials, if necessary"); Ayers v. SGS Control Servs., Inc., 2007 WL 646326 (S.D.N.Y. Feb. 27, 2007) ("to the extent Defendants

13

present individual defenses, 'the Court may grant collective action and bifurcate trial, as necessary, to address those defenses'") (quoting Torres v. Gristede's Operating Corp., 2006 WL 2819730 at *11 (S.D.N.Y. 2006)).  Therefore, the Court finds bifurcation of this action to be appropriate.  Plaintiffs' Motion for Bifurcation [155] shall be granted.

D.      Fairness and Procedural Considerations

        Defendants argue it would be unfair and unmanageable to allow Plaintiffs to bring their claims collectively.  Plaintiffs, on the other hand, argue that decertification would be the most unfair outcome as each opt-in Plaintiff would be required to re-file their claims individually, which would be both costly and time prohibitive.  Plaintiffs argue that liability can be determined based on evidence common to the entire class and by use of representative testimony.  Defendants, however, maintain that distinct proof will be required for each Plaintiff.  They contend that selecting only a few Plaintiffs to testify as representatives for the entire class is inappropriate because liability is dependent on the individual facts and circumstances of each Plaintiff.  By contrast, Plaintiffs contend that representative testimony is appropriate because the only issue requiring individualized proof is the amount of damages for each Plaintiff.  Plaintiffs assert that damages have already been calculated using Defendants' own records and argue that damages are likely to be stipulated to by the parties.

        Having rejected Defendants' contention that issues of liability in this matter must be resolved on an individual basis, the Court sees no reason why representative testimony would be inappropriate.  As one district court in our circuit has recognized,

>       [i]n Fair Labor Standards Act ("FLSA") cases, Plaintiffs may prove their case using representative testimony.  A defendant may then respond with evidence that 'individual employees are excepted from the pattern or practice' and with evidence that 'would tend to negate the inferences to be drawn from the testimony

14

of the representative reporters.'  A court may decide to decertify the action, even after deciding motions on the merits, in light of trial evidence that the certified plaintiffs are not similarly situated.

Roussell v. Brinker Int'l, Inc., 2009 WL 595978 at *1 (S.D. Tex. Mar. 6, 2009) (citing Reich v. Gateway Press, Inc., 13 F.3d 685, 701 (3d. Cir.1994); Johnson v. Big Lots Stores, Inc., 561 F. Supp. 2d 567, 571–72 (E.D. La. 2008)). See Albanil v. Coast 2 Coast, Inc., 444 F. App'x 788, 806 (5th. Cir. Oct. 13, 2011) (collecting cases).  At this point in the proceedings, based upon the evidence before it, the Court finds no support for Defendants' argument that representative testimony would be inappropriate or inadequate.

The Court recognizes that Plaintiffs have filed a Motion for Representative Testimony [161] to which Defendants have not yet responded.  However, in the exercise of its discretion to manage the litigation of this action, and in light of the fact that arguments both for and against the use of representative testimony have been raised in the parties' briefing of Defendants' Motion for Decertification, the Court need not reserve its decision on this issue until such time as full briefing in response to Plaintiffs' Motion for Representative Testimony may be filed. Rather, the Court may allow representative testimony in its own discretion and as it sees fit. Accordingly, the use of representative testimony will be allowed at trial.

Finally, Defendants contend the differing damages amounts asserted by each Plaintiff preclude class-wide liability.  They argue that a highly individualized inquiry would be required to determine damages for each individual Plaintiff, consisting of comparing each Plaintiff's daily travel and time log to the corresponding pay stub for each pay period in question.[7]  In response,

---

[7] Defendants also contend that such differing damages amounts serve as evidence that Plaintiffs were not subjected to a common policy that affected them each in the same manner.  As explained *supra*, the Court has determined Plaintiffs' claims are based on evidence of common policies.  That Plaintiffs did not suffer identical damages as a result of those common policies does not change the Court's determination that they are similarly situated.

Plaintiffs argue that the issue of differing damages is irrelevant for purposes of decertification because Plaintiffs are otherwise similarly situated and issues regarding liability are common to the class as a whole. Further, Plaintiffs argue that all the alleged work at issue occurred after the Plaintiffs clocked in and before they clocked out. Thus, they argue damages are easily ascertainable and have already been calculated to the penny using a single formula and Defendants' own records. Whereas the Court has determined this action should be bifurcated as to liability and damages, Defendants' arguments are without merit. Concerns as to individual damages calculations do not prevent this action from fairly and efficiently proceeding collectively at the liability stage and may be properly addressed at the damages stage.

*Conclusion*

For the foregoing reasons, the Court finds Plaintiffs are similarly situated for purposes of § 216(b) collective action certification. Therefore, Defendant's Motion for Decertification [131] is DENIED. In ruling on this motion, the Court additionally holds that the trial of this matter shall be bifurcated, and Plaintiffs will be allowed to present representative evidence of their claims. Plaintiffs' Motion for Bifurcation [155] and Motion for Representative Testimony [161] are GRANTED. A separate order to that effect shall issue this day.

SO ORDERED on this, the 31st day of October, 2013.

_ /s/ Sharion Aycock _____
**UNITED STATES DISTRICT JUDGE**